May it please the court, Mr. Chief Judge. My name is Jason Owens. I represent Conway County, Arkansas and several of its jail officers in a case in appeal of a denial of qualified immunity by the district court. This case centers around the tasing of an inmate by an officer named Zolpo and involves something of a Hobson's choice for this particular jailer and his fellow jailer against whom a duty to intervene claim has been made. With respect to Officer Zolpo, which is kind of at the core of this case, the undisputed facts are that he tased an inmate twice after this inmate refused a lawful order. I think there are several important undisputed facts. First, that a lawful order was made. This order was made for him to move from his cell, I believe in the A block of the jail, to the medical observation cell because he had been complaining about pain and was scheduled to see the doctor in the morning so they were going to move him to the observation cell. In addition, they were moving him for safety, security and order reasons because it's also undisputed that he was screaming and hollering in the back of the jail at 8, 9, 10 o'clock at night disturbing the other inmates. Incitement is a real danger in jails and one that the officers felt it prudent to deal with. It's also undisputed that this inmate had the ability to comply with the order. We know that not only from hindsight because he did actually comply at the conclusion of this encounter, but we know it on the front end as well because he had been taken to the A block where he was at only a couple of hours prior and walked under his own power without difficulty. We also know that when the officer gave the command and the inmate refused, that he leaned in in an attempt to use what I've referred to as hands-on force to essentially grab him and escort him to the observation cell and was kicked. Accidentally? Well, that's how one, the observing officer characterized it as accidental. That's got to be assumed against you at this point, right? Agreed. Agreed. But I think it's a distinction without a difference because... Well, now wait. Oliver Wendell Holmes famously said, even a dog knows the difference between being kicked and tripped over. I think there's a big difference whether it's accidentally or on purpose. Well, except that the standard here is objective reasonableness from the perspective of the officer using the force. And so... Well, that's the same officer who says accidentally is the one that hands the taser over. Well, but that's the observing officer. That's not the one that used the force. The one that used the force was Officer Zolpo, and he doesn't use... One that says accidentally is the one that hands the... Right. Right. Officer Zolpo, the one who actually uses the force, doesn't use any of this accidental language. In other words, there's no indication... He uses very few words. You can't tell whether he uses accidentally or on purpose. Right. There's no indication from his testimony that he perceived this incidental, I guess is the point. Does he essentially admit that he's using the threat of the taser and then actually using the taser to get Mr. Smith to move, to get up and move? Well, I think so, Your Honor. I think ultimately that's the rationale for the use. Then how do you distinguish the Hickey v. Reeder case with a stun gun, where we've said, right or wrong, we've said you can't use a stun gun anyway, which is pretty close to a taser. You can't use a stun gun to force somebody to comply with your order. Well, I think the distinction here, and I think it's an important one, because this is an important choice that has to be made by jailers fairly frequently, I would say, in the sense that they go in and give an order to comply. Now, certainly not all lawful orders are the same in the sense that some are more important than others and some there's better alternatives than others. But when you ask an inmate to move from one cell to the other, there really are no other alternatives. If you back down, then you'll never be able to get one inmate to move from a cell to another when he doesn't want to ever again. Counsel, address the Hickey case. It's from Arkansas. It looks a lot like your case, just somebody not too smart. Except that in the Hickey case, based on my reading, the officer didn't attempt to use hands-on force and wasn't battered by the inmate before using the taser. Here, he attempts this other use of force. But wait a minute. We've got to assume that he wasn't kicked, I think, right? No, I don't think so, Your Honor. And the reason I say that is, on page 156 of the appendix, the plaintiff, an appellee here on this appeal, admits, concedes, that he was kicked, citing, I believe, to Mr. Choate's deposition. I'm going to ask counsel about that, because they've said several different things. Well, now, if you take his, the best you do on him are his responses on everything, where his statement of facts in support of the motion for summary judgment, his response to summary judgment, he says the accidentally. Right. They all say here, this must be an Arkansas-ism, accidentally. Go ahead. Right. He cites to the observing officer's testimony that he was kicked, but it was accidental. Apparently attempting to make the point that, well, yes, there was a kick, but it was accidental. Nonetheless, though... Of course, it's not so clear by that same thing. It says, during the tasering process, comma, the one sentence says, and the other is reacted and accidentally kicked. It's not clear when the kick happened by what they admit. Except that I believe in the appendix there, it says he attempted a pressure point technique. Undisputed that that attempt came before any tasering occurred. In fact, before he even took the taser from the other officer. So you're relying on the response to the motion for summary judgment and not the statement of facts? Yes, your honor, because I think this court has been clear that one cannot avoid summary judgment by contradicting himself. One can't take one position and then do an about face in an attempt to avoid summary judgment. That's what's happening here. Okay, let's assume that he did kick accidentally. How do you distinguish Hickey? That alone? I would distinguish it on this basis, your honor, if there are only so many ways you can get an inmate to comply with a lawful order. And in particular, this is one that has to be accomplished. You have to move this inmate from one for those safety and security reasons, for those medical reasons, and where you've attempted to use a different type of force to accomplish that and been met with not only resistance, but violent resistance. You have no other choice but to move on to other levels of force. And that's what happened. There's nothing in this record. And I certainly don't know how you move prisoners on a regular basis. But I have to think that throughout our prisons in this move detainees or prisoners all the time who are unwilling to do it and they do it without tasering them or shooting them or anything like that. There must be a physical way or at least a threat of loss of time, good time or something that they get threatened with. Well, while that state of Arkansas is where I know about. Like the Pulaski County Jail? Well, the Pulaski County Jail is the largest county jail in the state of Arkansas. Much, much larger. They hold a magnitude of hundreds of times more inmates. That's the Hickey case. Hickey implies that there were six or seven officers in and around the cell. And that's the way they should have done it. So now instead of the other one trying to help, the other one says, here, take the gun and do it. Well, I don't think that conversation occurred. No, it was unverbal. Certainly he took the deposition testimonies unverbal, unverbal. Right. He took the taser from the other officer. Correct. But the distinction, I think, is not only the difference in the size and magnitude and the ability to respond otherwise, but also with respect to the attempt being made to do something different. You know, it's very difficult where you have these small rural jails where you only have one or two officers. Let me, you know, you're familiar with this, but Hickey says, as a matter of law, use of a stun gun to enforce the order to sweep was both an exaggerated response, can't read my own scribblings, and summary corporal punishment that violated the Eighth Amendment. How do you get around that language? Well, I get around it with the distinction of, in Hickey, they had not the process. Here, this officer had given a lawful order to an inmate. Well, my point is just, I want you to just face that particular statement there. It seems like that statement is saying, we don't care what the circumstances are. If you use a stun gun or, let's say, a taser here to enforce an order just for there was to sweep here to get up and move, that it's a violation of the Eighth Amendment per se. Well, I certainly don't read Hickey that broadly. That's the holding of Hickey at the end. He's got it word for word. No, and I understand, I agree with your reading. I'm not saying you read it wrong. I'm saying the application, I don't think, is as broad as you would propose, and respectfully, I say that I think that the facts here are very different, and to hold otherwise would leave jailers in this situation with no choice but to essentially back down from this inmate and allow him to do as he chose. Okay, so you distinguish Hickey by that here we had kicking in an attempt to use physical force, the ear pressure point, anything else? Well, it comes down to what are the other options. If the only option is to go back in and get kicked again. Go back in with two people, go back in with at least two people. Right, but I don't think the case law requires officers to go back in and get kicked or hit again, and doesn't allow them to move to different levels of force once they've already been attacked in that manner. Well, they could also just close the door and lock it, go get help, and come back. Now, I don't know, maybe it's such a small place you only have two jailers. I don't know. Well, I think that's the proof in the record, and certainly no different proof, but that's the distinction I would draw with Hickey is that the facts are so starkly different. A much smaller jail, a much different circumstance, and they attempted to use other nature of force and were rebuffed physically, and to me that brings this outside the scope of Hickey. I'll reserve the remainder for rebuttal. Okay, thank you, Mr. Owens. Good morning, Mr. Porter. Good morning, Your Honor. How are you doing? Good. Good to see you again. Could you clear something up for me on this kicking? In the plaintiff's statement of undisputed material facts, you state during the tasering process, Mr. Smith accidentally kicked Mr. Zuppel, and then in the plaintiff's response to the defendant's statement of undisputed facts, you say when Officer Zuppel applied a pressure point to the plaintiff, he reacted and accidentally kicked Zuppel, and then in your brief here to us, you say Mr. Smith denies that he kicked Zuppel. That's correct, Your Honor. How can you deny it when you twice have it in your pleadings? I'm sorry? How can you deny it in your brief when you twice have it in your pleadings? Your Honor, as far as about the kicking is concerned, I think the kicking is really just a red herring in this case, because maybe, but let's, you know, what is your position on the kicking? Well, Your Honor, the kicking, there was testimony from Jansen Choate, the officer who observed that when Zuppel tried to apply a pressure point to the back of the ear, that there was a reaction and that there was an accidental kick. And so either there was an accident, you know, Choate, the officer testified that there the kick occurred, it didn't occur. I just really think that's a red herring in the case, because here you have a situation where a man, 56-year-old man, who's a Vietnam veteran, is lying down in his bunk and he's yelling for help saying that he needs a medication, he needs to be taken to the doctor. And the officers were told by the jail administrator that under no circumstance will this man be taken to the hospital. And that the sole purpose of them going back to the cell block where Mr. Smith was alone, and we're talking about the entire cell block, he was moved from, I believe, from cell block B to cell block D, and at the time D was an unoccupied cell block. He's the only person that's in the cell. And so he's locked in the cell, and they went back there for the purpose of getting him up. And I'm glad Mr. Owens admitted during his argument that the taser was used because Mr. Smith simply refused a lawful order. I mean, that's something he admit, and I'm glad that he admitted that. And that's something that Hickey said, you can't do. In this situation, the sole purpose that the officers wanted, they wanted, the compliance was, we wanted this man to get up on his own and to get his stuff and to move. That was their order. And that was what they were trying to do. And that's all contained throughout the record in this case. And so Hickey said, you can't do that. And Mr. Smith is telling these officers, so look, I'm hurting. I'm in pain. I can't get up. He would ask for assistance in getting up. And we all know, first of all, Hickey dealt with a stun gun. This is a taser. Tasers shoot out these powerful darts like fish hooks, and these darts come out very rapidly, and they cause a tremendous amount of pain. And not to, you know, the darts entering the body itself, this is pretty dangerous stuff. These taser darts can, you know, penetrate bone. They can do a lot of damage once they go into the body. And not to mention the 50,000 volts of electricity that's been emitted during the five cycle tasering cycle. And so this is a situation where these officers did not have to use a taser at all. Their choice was, Your Honor, they could have just simply backed out of the cell, left the man alone. I was going to ask you, so what is their option? They had two officers there, two jailers. Yes, sir. If they weren't to use a taser, what option did they have? Your Honor, they could have grabbed the man, picked him up, escorted him out of the cell. That's what he asked. He asked for assistance. Will you please tell me? Is this kicking and screaming they can do this? I'm sorry? If your client is kicking and screaming, can they do this? Your Honor, my client wasn't kicking and screaming. If your client were, I'm playing with you, your game. The two grab him, they start to take him out. Now, is it your view if he starts kicking and screaming and just waving the arms and fighting in every respect, and they're just two of them, they still have to try to remove him? In Hickey, this man had threatened to beat the officer up. Hold on. The court says that doesn't count because that occurred before everybody else and there's no evidence the other six or seven knew about it. Right. Right. And also it says there's six or seven officers here, they're just two. Right. But also in Hickey, your Honor, you had an inmate who was standing up. He was waving his arm in front of these other officers and he was doing that. In this case, Mr. Smith is laying down in his bunk. And when the officer, when Zopo tried to put this pressure point behind his ear, the testimony is undisputed that he backed further up against the wall onto his bunk. And so, and the whole purpose behind a taser is to give an officer, the officers, an opportunity to incapacitate a person. Once they're incapacitated, it gives an officer an opportunity to go and grab the person and then to do whatever they need to put them in handcuffs, put them in a strength. But that didn't even happen in this case. When Mr. Smith was tased the first time, there was testimony that he was about to roll off his bed and then the officer went and put him back onto his bed. And then the officer, Zopo, started telling him, look, you got three seconds to comply on my order by getting up. And I asked him, well, what was the order? The order was he needed to get up, get his stuff and to move. And the officer started counting down, three, two, one. And then he applied a second taser. The alternatives they could have done. I thought your argument was going to be that out on the street you have a police car, may only have two officers in it, and they've got somebody that's violent. They're trained to take them down and to hold them and get them to comply. That's correct. Without, in the typical sense, without shooting them or tasering. Are these jailers, I mean, is that what your argument? These jailers should be trained? I know you've got a training issue here, but that they're not trained or they should have been trained to be able to handle this without the tasering? Well, your honor, there was testimony that one of these officers had worked previously at a Wendy's restaurant. And I believe Zopo testified he had no training in reference to the use of a tasering. And it was also the policy of the Conway County Jail that. I'm talking about whether they were trained to handle a situation like this in other methods other than shooting the guy. Your honor, common sense could have just told as the district court said, leave the cell, lock the door and leave the man alone. I mean, that was the option that they had in this situation. Again, Mr. Smith asked for assistance in getting up. They refused that. And if they didn't want to assist the man in getting up, they should have just left him all alone, left him in the cell. And, you know, there was no problem in doing that. And so that was an option that they had available. I really cannot distinguish this case from that of Hickey because he just suggested and you tell me what what your answer this is, that the language in Hickey that I read and I'm going to read it again, they're saying there's a matter of law, so forth, that that's awfully broad, broad language and that we should limit Hickey to the facts. What's your response to that? Because that statement I read, read to us. I mean, if that's the law of the Eighth Circuit, that would cover this and many other cases. So should should it be limited? Hickey be limited to its facts. And if not, why not? Your Honor, again, I can't distinguish the facts of Hickey versus the facts of the case in this in this case. What the officer was trying to do was to trying to get the Mr. Smith to get up, get his stuff and move. What the officer in Hickey were trying to do was to force the inmate to sweep. And when the inmate refused to sweep, he was tased, he was punished. And in this situation, when Mr. Smith in the officer mind refused to get up, that was their compliance. That was their order. When he refused to do that, then they punished him by tasing him. And that was undisputed in this case. Counsel, does the record reflect how many officers were in and around the cell? In this case, Your Honor, in this case, there were two there were two officers present in this particular cell. Does it talk about how many others were anywhere nearby? No, Your Honor. I mean, Hickey says there are six or seven in around that that affected it. Correct. Also, Hickey says at no time did the officers attempt to remove Hickey here. They tried to remove him. No, Your Honor. I disagree with you. They didn't try to remove him. What the testimony was, it says that Officer Zopo went in and tried to do it, do a pressure point. And that was the purpose of that. And what I think Mr. Owens said, they also tried to grab and remove him. That wasn't the situation. They put a pressure point. Mr. Smith reacted by yelling that he was hurting him and that he retreated further back into his bunk. That was the testimony that happened as far as in this case. And if you look on page 84 of the joint appendix, and so I'm asking Jansen Shope, you know, he's talking about you got three seconds to get up on page 84. So basically, Zopo said you got three seconds to get up. Zopo counted down to three and then Mr. Smith didn't get up. That's when he popped him again with a taser. Is that correct? And he said yes. And so this is the second tasering that happened as far as when that occurred. Again, Your Honor, the sole purpose, and if you look on page 90, the jail administrator, Mr. Emerson, is telling the officers that they ought to use the tasers to force compliance with orders. And they even have signs posted throughout the cell, posted throughout the jail, that telling inmates that if you don't comply with orders, you are subject to be imprisoned. Are those signs in our record here? Your Honor, I asked for them. I couldn't get one because they had changed jail administrators by that time and that jail administrator had all the signs removed. Were they described in depositions or affidavits or something? They were, Your Honor. And when I asked... Deposition? Really, both of the officers, Your Honor, I asked them what did the... About the sign? Yes, Your Honor. I believe if you look on page 60 of the record, I'm sorry, I asked specifically about those signs. We can find if it's not, but you say it is in there. Yes, sir. Your Honor, I asked both of the jailers what did the sign say and they basically testified that the sign said if you don't comply with orders, that you will be tased. And so that's clearly in the record. I apologize, I can't find it right now. We'll find it. But again, Your Honor, this... And if you look also on page 80 of the record, I'm asking the officer, what is Mr. Smith doing? He said he's laying down. This is the first time when he was tased. The man is laying down and he's retreated back into his bunk. And they want him to get up. And he... And I guess when he did not get up. And then on page 80, Mr. Chote, Jansen Chote is saying he's rocking back and forth when Mr. Zopo applies his pressure point to gain his attention and compliance. Mr. Smith freaks out. Mr. Smith then backs up to the wall, sits up, and this is when he beats his chest telling the officer to tase him. Of course, Mr. Smith denies that, but this was a disputed fact. So how do you... What's your argument on Chote and Emerson? What's your argument on Chote and Emerson? Well, Your Honor, as far as Chote is concerned, if you look on page 82 of the record, starting at line 18, it says he's basically talking about the tasering of the first time. And Chote said... And when he didn't do so, we proceeded to tase him. And so that kind of takes the argument away from Chote. Mr. Chote was a willing participant. Mr. Chote had a history of tasering inmates while... Inmates in the jail who did not comply with orders, and that's in the record. And so he was a willing participant. And when Mr. Zopo stuck his hand out for the taser, Mr. Chote gave it to him. And so Mr. Chote did not do anything to prevent this from occurring. And Mr. Chote even saying, we proceeded to tase him. And so that deals with that. Emerson, Your Honor, Emerson is a jail administrator. These officers are simply acting pursuant to his policy. His policy is that he has zero tolerance for noncompliance. Any inmate who doesn't comply, you can tase him. And that's what his policy is, and that's what he trained his officers to do. And that's what these officers testify to. If you look on page 70, I believe it's 77. Again, that's when Mr. Emerson told them that they were not going to take Mr. Smith to the jail, I mean, to the hospital to receive any type of treatment. On page 90 of the record, Mr. Emerson is testifying, not testifying, but there's testimony from Zopo. And it says, and what did Mr. Emerson tell you? That's when I asked the question. This is on page 90 of line 12. And Mr. Emerson said on a regular basis, he discussed with all the jailers that you would use a taser for your protection if you're in danger and for compliance. And so these are the specific instructions that Mr. Emerson, the jail administrator, had given to his particular jailers. Again, the court has already spoken in Hickey v. Reedy. This decision was back in 1993. These officers were certainly on notice that you can't use a taser just for the purpose of trying to get someone to comply with an order. Mr. Owens argued that that was the sole purpose of the taser, was to get Mr. Smith to comply with a lawful order. And when Mr. Smith didn't do it, the man was tased. And not only was he tased once, he was tased twice. And the taser was not for the purpose to gain control of a person who certainly wasn't being combated. Yeah, he was asking for help. He wanted to go to the hospital. And that was something that the jailers were not going to allow to do because jail administrators said, you're not going to do it because the county doesn't want that expense. That's all I have. You have any questions? No. I think that's it. Thank you very much. I'm out of time. Thank you, Your Honor. Mr. Owens, you have some time left? Yes, Your Honor. I think I have just a few minutes. Now, as I recall, Mr. Smith here is a pretrial detainee rather than convict. That's correct. And I think that's the distinction. Does that make a difference? He should be treated a little better? I do think it's well. As well or better? I think the same standards have been used with respect to both, generally, in the court. Well, we've never said what the standard is other than to say it's at least the same. At least the same. Right. And so maybe it's a distinction without a difference, but certainly a distinction. I did find it interesting, this phrase of, should we confine a case to its facts? Of course, the cases and controversies requirement kind of presupposes that, that every case is confined to its facts. Every case holding, that is. I think that's especially true in the context of qualified immunity, where you're asking a lay officer to read these cases and determine what the holding means in the context of the facts and how it applies to future circumstances. And so I think it's particularly important. You make a good point. How could an officer read Hickey without coming to the conclusion that he could not taser him to make him comply with an order? Well, because this was so different. Because in Hickey, they didn't try to remove him. Here they did. Page 128 of the appendix, Officer Zolpo clearly says, I leaned over and tried to help him up in order to move him. I mean, that's exactly why he leaned over and he got kicked for it. And so I think this is so substantively different. Even the reasonable officer couldn't have drawn the conclusion that his conduct was foreclosed by Hickey. What about these signs and so forth that are, apparently the policy is that if you don't comply with the order, you could be tased. Don't you think that's totally in violation of Hickey? Well, if they were effectuated, I don't think there's any particular problem with signage in a jail that tells someone something, even if it's not going to occur. Hickey has a little short sentence. The law does not authorize the day-to-day policing of prisons by stun gun, period. Boy, those signs violate that, huh? Well, I think if they were effectuated, I think they would. I think a sign on a wall doesn't have anything to do with the day-to-day policing as such of a jail, as opposed to the conduct of the jailers. And so the question is, in my view, should Hickey be broadened in this case to say, well, even where you attempt everything else, we'd rather you go get six or eight folks off the street and come in. Now, I might disagree with you, and I think Mr. Porter would disagree with you that they attempted everything else. Well, they attempted one thing. They attempted one thing, but it begs the question of what are the other alternatives? It seems to me the only other alternative is to allow your lawful orders to go without effectuation, to be refused. We do have a duty to provide medical care. I mean, that's part of the reason we were moving this guy. And so the question is, is it better to corral all the deputies off the street and bring six or eight guys in and have the barroom brawl with him than to use the taser? I think as a matter of constitutional law and certainly public policy, that holding wouldn't be appropriate. Even if the court comes to it, I do think it's broadening. And so I think this officer would be entitled to qualified immunity. Okay. Thank you very much. Thank you, Your Honor. Well, we appreciate your arguments. We thank you both for your briefs and your oral arguments. And we will be back to you as soon as we can.